UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BYRON RATCLIFFE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00074-JMS-MJD |
| | ) | |
| JOHN PLASSE, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Byron Ratcliffe was a pretrial detainee in the Vigo County Jail from August 2020 until October 2021 during the COVID-19 pandemic. He filed this civil rights suit alleging that he was subjected to unconstitutional conditions of confinement while he was incarcerated in the jail, and, as a result, he contracted the virus. The defendant, Vigo County Sheriff John Plasse, has filed a motion for summary judgment. Dkt. 26. For the reasons below, that motion is **granted** as to Sheriff Plasse in his individual capacity but **denied** as to claims against him in his official capacity.

**I.**
**Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572−73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II.
## Factual Background

Because the defendant has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

2

### A. COVID-19 Policies at the Vigo County Jail

On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[1] The Vigo County Jail undertook health precautions at the direction and recommendation of the Vigo County Department of Health. Dkt. 27-2 at ¶ 36. Jail Commander Charles Funk and Jail Matron Casey Lee were responsible for the day-to-day operations at the jail. *Id.* at ¶¶ 1, 5−6.

Inmates booked into the jail were quarantined for two weeks beginning in March 2020. *Id.* at ¶ 7.

The jail issued masks to inmates attending court hearings in June 2020. *Id.* at ¶ 8. Jail staff began wearing masks in August 2020. *Id.* at ¶ 9. Masks were given to inmates who were in quarantine, leaving general population, moving around the facility, and in common areas in November 2020. *Id.* at ¶ 11.

In December 2020, an inmate who died following a medical episode tested positive for COVID-19. *Id.* at ¶ 13. The Indiana Department of Health ordered that all of the inmates in the jail be tested following his death, and over 100 inmates, including Mr. Ratcliffe, tested positive. Dkt. 27-3 at ¶¶ 7−8; dkt. 27-4 at 1. After this COVID-19 outbreak, all inmates were provided masks. Dkt. 27-2 at ¶ 19.

After the outbreak, the Indiana Department of Health instructed the jail to be locked down. *Id.* at ¶ 23. Inmates who tested positive were placed in separate cellblocks and quarantined for two weeks. *Id.* at ¶ 21. During the lockdown, inmates were allowed out of their cells for one hour each day to shower and speak with family by phone or through the kiosk. *Id.* at ¶ 24. The jail's medical department spoke to inmates in groups about what a positive COVID-19 test meant and what signs

---

[1] *See* Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," https://www.cdc.gov/museum/timeline/covid19.html (last visited Jan. 13, 2022).

and symptoms to look for. *Id.* at ¶¶ 25−26. Jail officers were instructed to contact the medical department if any inmate complained of COVID-19 symptoms. *Id.* at ¶ 30. The jail has suspended recreation since the outbreak. Dkt. 27-3 at ¶ 9,

Inmates are provided with cleaning supplies each day, which include a mop, a mop bucket with a cleaning solution with disinfectant, dust mop, toilet brush, spray bottle, and rags. *Id.* at ¶¶ 12−16. Trustees began disinfecting hard surfaces and holding cells in March 2020. *Id.* at ¶ 15. More cleaning materials were provided after the December 2020 outbreak. *Id.* at ¶ 17. A "fogging machine" was purchased in December 2020 and is used several times a week to disinfect the isolation, hospital, and solitary cells, as well as high traffic areas. *Id.* at ¶ 19.

COVID-19 tests were not available at the jail until December 2020. Dkt. 27-2 at ¶ 12. COVID-19 vaccines became available in March 2021. Dkt. 27-1 at 35.

### B. Mr. Ratcliffe's Illness and Claims

Mr. Ratcliffe was a pretrial detainee at the jail from August 2020 until October 2021. Dkt. 27-1 at 12. He was quarantined for fifteen days upon being booked in the jail. *Id.* at 17. Once in the jail, Mr. Ratcliffe asked jail staff why inmates were not wearing masks and why hand sanitizer was not available when these practices were being observed on the outside. *Id.* at 19.

Mr. Ratcliffe began to feel sick toward the end of November in 2020. *Id.* at 20. He had lost his sense of taste and smell, and his body and throat were sore. *Id.* at 20, 24. He was seen by the nurse, who advised him that no COVID-19 tests were available. *Id.* at 21. She told him that she could prescribe him Tylenol, but he purchased some from commissary because it was cheaper than the prescription. *Id.* at 21−22. Mr. Ratcliffe had these symptoms for three to five days. *Id.* at 24. He was no longer symptomatic when he received his positive test result. *Id.*

The inmates received cloth masks after the outbreak. Dkt. 27-1 at 28. Mr. Ratcliff said the

masks were of "[v]ery poor quality[,]" and he asked a friend to send in N-95 masks. *Id.* at 27−28. She did, but only jail officers were allowed to wear the N-95 masks. *Id.* at 27.

Mr. Ratcliffe testified that he is suing the Sheriff because he believes more should have been done to protect him and the other inmates from COVID-19. *Id.* at 29. Specifically, he believes Sheriff Plasse should have provided N-95 masks, hand sanitizer, and more soap to the inmates. *Id.* He believes the Sheriff should have taken steps to reduce overcrowding.[2] *Id.* at 30. He also attested that the quarantine period upon booking was ineffectual because inmates who were completing their quarantine were intermingled with inmates who had just arrived. *Id.* at 31, 34−35. Also, if a quarantined inmate was out for his hour of recreation, he could talk to other inmates through their cell doors, possibly exposing them to the virus. *Id.* at 32. While the inmates were quarantined, they used plastic utensils and Styrofoam trays, but they subsequently switched back to normal trays, and Mr. Ratcliffe believed "the sanitation [was] horrible." *Id.* at 30.

Mr. Ratcliffe attributes the poor COVID-19 policies on the fact that Sheriff Plasse, Lieutenant Lee, and Captain Funk rarely visited the jail to monitor the conditions. *Id.* at 39−40. He testified that "Sheriff Plasse doesn't know what is going on in his own jail because Sheriff Plasse never sees his own jail. He never comes up to the blocks. . . . And the people that work for him or oversee his duties as far as the county jail" do not visit the inmates either. *Id.*

### III.
### Discussion

Mr. Ratcliffe argues that his rights were violated because Sheriff Plasse failed to implement enough safety measures to prevent COVID-19 from spreading in the jail, resulting in his illness. Sheriff Plasse argues that he is entitled to summary judgment because (1) he was not personally

---

[2] The Court takes judicial notice of the proceedings in *Huerta v. Plasse*, 2:16-cv-00397-JMS-MJD, which corroborate Mr. Ratcliffe's contention that at all times relevant to his complaint, the Vigo County Jail was overcrowded.

involved in protecting Mr. Ratcliffe from COVID-19, and (2) the Sheriff's Department did not have a policy, custom, or practice of violating Mr. Ratcliffe's Fourteenth Amendment rights.

### A. Individual Liability

"Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). "[S]upervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018); *see also Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002) ("Under § 1983, there is no respondeat superior liability.").

There is no evidence that Sheriff Plasse had any personal involvement in actually implementing the COVID-19 policies or monitoring enforcement of the policies. Accordingly, summary judgment is **granted** as to Sheriff Plasse in his individual capacity.

### B. Practice-or-Policy Claim

The Court now turns to whether Sheriff Plasse is entitled to summary judgment in his official capacity. *See Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) ("Indiana Code § 36-2-13-5(a) provides without further qualification that it is the sheriff's duty to take care of the jail and its prisoners. Thus, . . . the sheriff serves as the county's official decision-maker in matters involving the county jail.").

In order to maintain a § 1983 claim against Sheriff Plasse in his official capacity, Mr. Ratcliffe must show that his constitutional rights were violated by a policy or custom of the Sheriff's Department. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694−95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

For *Monell* liability to attach, Mr. Ratcliffe must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Sheriff's Department custom or policy or failure to implement a needed policy. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Further, to the extent that he is challenging a facially lawful policy (express or implied), he must provide evidence of a "pattern of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). If he is challenging an unconstitutional municipal practice or custom, he must show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up).

### i.   Deprivation of a Constitutional Right

Generally, conditions-of-confinement claims for pretrial detainees, which are derived from the Due Process Clause of the Fourteenth Amendment, are analyzed under an objective standard. *Hardeman v. Curran*, 933 F.3d 816, 821−22 (7th Cir. 2019). Under this standard, the plaintiff must show that the conditions (1) pose an objectively serious threat to his health or safety, and (2) that the defendants' response is "objectively unreasonable" given the totality of the circumstances. *Id.*

However, *Monell* liability only attaches when the plaintiff shows that the municipality acted with deliberate indifference. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020). As the Supreme Court has explained,

> [Q]uite apart from the state of mind required to establish the underlying constitutional violation . . . a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.

*Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407 (1997); *see also Miranda v. County of Lake*, 900 F.3d 335, 345, 352 (7th Cir. 2018) (applying deliberate

indifference standard to pretrial detainee's *Monell* claim despite disavowing that standard for pretrial detainee's claims against individual defendants).

Thus, the Court analyzes Mr. Ratcliffe's claim under the deliberate indifference standard. Under that standard, Mr. Ratcliffe must show that he was at serious risk of exposure to harm, and the Sheriff "kn[ew] of a substantial risk of harm to an inmate and either act[ed] or fail[ed] to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). The fact that Mr. Ratcliffe contracted COVID-19 is not enough to show deliberate indifference because the sheriff can avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

There is no dispute that the COVID-19 virus created a serious risk of harm to detainees' health, and that the general risk of exposure is exacerbated by the close quarters that detainees are subjected to. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that "the objective prong is easily satisfied" as to inmates' claims under Eighth Amendment challenging conditions of confinement in federal prison with dormitory housing at the start of the pandemic).

Thus, the Court must determine whether there is a dispute of fact as to whether the Sheriff's policies related to COVID-19—or lack thereof—evinced deliberate indifference. The Court concludes there is.

First, a jury could find that Sheriff Plasse was deliberately indifferent by failing to create a comprehensive written policy to combat the spread of COVID-19 in the jail. In *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017), the Seventh Circuit concluded that a medical services provider could be liable for failing to establish a protocol for the coordinated care of chronic illnesses because the need for such a protocol was "obvious," so a jury could find

that the lack of protocol caused the plaintiff's death. While the Court recognizes that the evolving nature of the COVID-19 virus and guidance provided by the CDC would warrant a flexible approach, a jury could find that the lack of a written policy resulted in a haphazard response in the jail.

To the extent that the Sheriff's Department had a policy to combat COVID-19, a jury could conclude that the few steps taken were so ineffectual as to evince deliberate indifference. In an overcrowded facility, no efforts were made to socially distance inmates.[3] There was no evidence that inmates were provided educational materials about COVID-19. Sheriff Plasse does not explain why jail staff members were not required to wear masks until August 2020, or why inmates were not provided masks before December 2020. There was no evidence that staff members were screened for symptoms upon entry into the jail. A jury could find that the few policies enacted— increased cleaning and quarantining incoming inmates—were insufficient in light of the serious risks posed by COVID-19 and other reasonable measures that could have been taken. *See Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (upholding grant of preliminary injunction where officials at immigration detention center failed to provide detainees masks or compel guards to wear masks, failed to enact social distancing measures, and failed to provide sufficient soap or hand sanitizer).

Many courts have granted summary judgment in favor of municipalities for their responses to the COVID-19 pandemic, but the jail officials in those cases enacted far more comprehensive policies than those presented here. *See e.g. Harb v. Penzone*, Case No. CV-21-01032-PHX-MTL,

---

[3] The Court recognizes that deference must be afforded to jail administrators in matters implicating safety and security concerns, including decisions related to inmate housing. *Mays v. Dart*, 974 F.3d 810, 820, 824 (7th Cir. 2020) (vacating portion of preliminary injunction that precluded Cook County Sheriff from double-celling inmates during COVID-19 because housing decisions implicated security concerns while upholding provisions regarding masks, sanitation, and testing). Here, though, the Sheriff provided no evidence related to social distancing efforts.

2022 WL 17177675, *12 (D. Ariz. Nov. 23, 2022) (Maricopa County Sheriff not deliberately indifferent where in March 2020 jail enacted policies that restricted visitors, reduced inmate populations, distributed masks and cleaning supplies to inmates, required staff and inmates to wear masks, instituted screening protocols for everyone entering the jail, etc.); *Brogan v. BRRJA*, Case No. 7:21-cv-00180, 2022 WL 875040, *5 (W.D. Va. Mar. 23, 2022) (similar provisions including masks, temperature checks, and testing); *Carpenter v. Thurston County*, Case No. 3:21-cv-05859-BJR-JRC, 2022 WL 3239754, *5 (W.D. Wash. June 13, 2022) (similar provisions including screenings, quarantines, face mask directives, social distancing, and enhanced cleaning). In this case, however, there are material disputes of fact as to whether the Sheriff was deliberately indifferent to the serious risks of harm given the minimal safety measures he undertook.

Further, Mr. Ratcliffe has produced evidence that multiple inmates were injured by the Sheriff's policies. *Helbachs Café LLC*, 46 F.4th at 530. One inmate tragically died, and over 100 inmates tested positive for COVID-19 shortly after his death.

Because there are material disputes of fact as to whether Sheriff Plasse's COVID-19 policies caused Mr. Ratcliffe to suffer a constitutional injury, summary judgment must be **denied** as to the official capacity claim against him.

## IV.
## Conclusion

For the foregoing reasons, the Sheriff Plasse's motion for summary judgment, dkt. [27], is **granted** as to Mr. Ratcliffe's claims against him in his individual capacity and **denied** as to claims against him in his official capacity.

The Court prefers that Mr. Ratcliffe be represented by counsel for settlement and trial. The Court has prepared a form motion to be used by indigent litigants seeking the appointment of counsel. Mr. Ratcliffe has **through February 22, 2023**, in which to either return a completed

motion for counsel form to the Court or object to the recruitment of counsel on his behalf. **The clerk** is directed to include a copy of the motion for counsel form with Mr. Ratcliffe's copy of this Order. The magistrate judge is asked to hold a settlement conference once counsel has been appointed.

      **IT IS SO ORDERED.**

Date: 2/3/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

BYRON RATCLIFFE
#127237
PENDLETON - CORRECTIONAL INDUSTRIAL FACILITY
CORRECTIONAL INDUSTRIAL FACILITY
Inmate Mail/Parcels
5124 West Reformatory Road
PENDLETON, IN 46064

David P. Friedrich
WILKINSON GOELLER MODESITT WILKINSON AND DRUMMY
dpfriedrich@wilkinsonlaw.com

Magistrate Judge Mark Dinsmore